1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   RICHARD MARC VIGIL,

11              Petitioner,              No. CIV S-02-1481 FCD PAN (JFM) P

12        vs.

13   THOMAS L.  CAREY, et al.,           FINDINGS & RECOMMENDATIONS

14              Respondents.

15   _____/

16              Petitioner is a state prisoner proceeding through counsel with an application for a

17   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges a 1998 jury conviction in

18   Sacramento County Superior Court of causing the death of a child under age eight years in his

19   care or custody, in violation of Penal Code § 273ab.  Petitioner claims that: (1) his confession

20   was involuntary and should not have been admitted as evidence; (2) the trial court's comments to

21   the jury violated his rights to due process and a fair trial; (3) the trial court's failure to conduct a

22   hearing on jury misconduct violated his right to a fair trial by an unbiased jury; (4) the prosecutor

23   committed misconduct by urging the jury to consider sympathy for the victim; (5) Penal Code §

24   273ab unconstitutionally permits a homicide conviction and first degree murder sentence absent

25   proof that the defendant acted with a culpable mental state; (6) his sentence is grossly

26   disproportionate to his crime; and (7) the court's instruction on propensity evidence undermined

1

1   the jury's obligation to find petitioner guilty beyond a reasonable doubt.  Upon careful

2   consideration of the record and the applicable law, the undersigned will recommend that

3   petitioner's application for habeas corpus relief be denied.

4                    PROCEDURAL AND FACTUAL BACKGROUND

5          Petitioner was charged in Count I with second degree murder and in Count II with

6   violation of California Penal Code 273ab.[1]  The jury convicted petitioner of Count II but was

7   unable to reach a verdict on Count I.

8          Petitioner filed a timely appeal of his conviction.  The California Court of Appeal

9   for the Third Appellate District affirmed petitioner's conviction in a reasoned decision.  The

10  court summarized the relevant facts as follows:

11          Tiernie Parsons, Leah's mother, testified Leah was born July 3, 1995.  She
            met [petitioner] that month and moved into his aunt Kerry Manolakas's
12          Sacramento house in July 1996.  About one week later they found an
            apartment in Carmichael.  In December 1996, she saw bruises on Leah's
13          older sister's bottom, and [petitioner] admitted causing them.  On the day
            Leah died, March 14, 1997, Tiernie left for work.  When she later saw
14          [petitioner] that day at the hospital he did not admit doing anything wrong,
            nor did he say he had tried to save [Leah's] life. [Petitioner] was the father
15          figure and caretaker for the children.

16          Fire captain Brian Rice testified he got a call at about 3:06 reporting
            "difficulty breathing in an 18-month-old infant child."  When he arrived at
17          the apartment, Leah looked like she was dying, with waxy yellow skin and
            bluish-gray lips, but she had a pulse.  He put her and [petitioner] in an
18          ambulance.  When a paramedic cut off Leah's shirt and diaper, Rice saw
            bruises on her arms and chest and knew "that we had something bad."
19          When they arrived at Mercy American River Hospital . . . he put
            [petitioner] in a room and directed somebody to have a security guard
20          "stand by that room."  During the ride, [petitioner] did not ask questions
            and "I didn't feel like his concern was on her at that point in time."
21
22          The paramedic testified [petitioner] initially said he was not going with
            Leah in the ambulance "and walked in the opposite direction.  [¶]  And we
23          were just starting the exam, and we noticed the bruising, and we asked the

24      _____
            [1]  Section 273ab provides, "Any person who, having the care or custody of a child who is
25      under eight years of age, assaults the child by means of force that to a reasonable person would
        be likely to produce great bodily injury, resulting in the child's death, shall be punished by
26      imprisonment in the state prison for 25 years to life."

                                          2

fire fighter to get Mr. Vigil and place him in the front of the ambulance." [Petitioner] showed "no emotional reaction toward this at all.  It didn't seem to bother him."  Had the paramedic been told what actually happened to Leah, he would have arranged for an immediate helicopter flight from the apartment to the U.C. Davis Medical Center (which has a trauma center), rather than taking Leah by ambulance to the nearest hospital.

Deputy Sheriff Richard Auleb spoke with [petitioner] at Mercy American River Hospital at about 4:25 p.m. [Petitioner] told him he woke up to find the older child sitting on top of Leah.  Later, Leah spit up some food on her clothing, but it was a minor incident.  When relatives arrived around 2:15 p.m., Leah looked pale, but he was not too concerned.  About 45 minutes later, the aunt found Leah limp with blue lips and they called 911.  When [petitioner] was told Leah was going to be life-flighted to UCD, "There was no real reaction to it." [Petitioner] did not ask whether the deputy had any news about Leah's condition.

[Petitioner's] aunt, Kerry Manolakas, testified that in December 1996 she saw marks on Leah's sister's bottom and counseled [petitioner] about other ways of handling children, and offered to help with child care.  On the day Leah was killed, Manolakas arrived at [petitioner's] apartment with her mother and two of her daughters around 2:15 p.m. [Petitioner] told her Leah was "taking a nap, but I'm concerned that she's not feeling well.  She's having a difficult time sleeping."  Manolakas found Leah to be cool, and she moaned when she was touched, however, she appeared to be breathing normally and seemed to be asleep.  She suggested [petitioner] put a shirt on Leah and he promptly did so.  At about 2:30 p.m. Manolakas rechecked Leah, asked [petitioner] to look at her, and again saw no cause for alarm.  When [petitioner] left to do laundry, Manolakas spoke with Leah's sister, who told her Leah had spilled cereal.  Later, Manolakas checked Leah and found her eyes open and "just black."  She asked her mother about this and then called for [petitioner], who said he did not know what was wrong. [Petitioner] seemed very upset and confused, and called 911.  In the hospital, Manolakas asked [petitioner] "You didn't get upset with Leah for spilling the cereal, did you?," to which [petitioner] said "I wouldn't have done that.  I could never have done that."

The emergency physician testified Leah came in at about 3:21 p.m. and he felt she could not be saved.  He arranged that she be moved to the trauma center.

Dr. Robert Anthony, the pathologist, autopsied Leah's corpse the next day, March 15, 1997.  It weighed 27 pounds and measured 33 inches tall.  There was blood in the abdomen, the layer of tissue which covers the intestines was penetrated and the pancreas had been split in two.  "[T]here was multiple blunt trauma involving the face, abdomen, right back, left and right legs and left arm."  Leah bled to death internally, due to the injuries.  The injuries were very unusual and he and colleagues he consulted had not seen them before.  "[I]f you could place a roll of nickels, representing the force and put it in that part of the abdomen, going straight down, that's how big an area that we're talking about."  "The force had to

3

be applied over a very small area on the child's abdomen. The child would have to be somewhat immobile so that it wouldn't be moving. And what would happen was there would be a rapid application of force in a small area on the abdomen that could be explained, as the detective suggested, by squeezing the abdomen with an adult hand. [Para.] This would be a pattern where the fingers would be on the back--on the child's back. The hand would curve around the abdomen, and the thumb would be in the front, and then by squeezing rapidly and burying the thumb in the abdomen, it would cause the application of force over a very small area. [Para.] It would cause tearing of the omentum. It would cause ripping of the pancreas, and it would not cause injury in any of the surrounding areas or tissues." When asked if a three-year-old could have inflicted the injuries, he said he could envision "A three-year-old carrying a one-year-old and dropping them [*sic*] down a set of stairs." A reasonable person knowing what had happened to Leah, who observed "the constellation of symptoms that this child shows," would have obtained help sooner.

Mark Gernandt, a detective with the Child Abuse Bureau of the sheriff's department, asked [petitioner] to talk with him and [petitioner]agreed. The interview room was equipped with a videotape. The jury watched the videotape and a transcript of the interview was placed into evidence. [Petitioner] at first sticks to the story that Leah and her sister were wrestling and Leah cried out. When Gernandt told [petitioner] information about Leah's condition might help in treating her, he persisted in his denial of knowledge. When Gernandt told [petitioner] Leah's sister had said defendant spanked Leah for spilling cereal, [petitioner] admitted getting mad and spanking and squeezing Leah with his hand. He hit her on the back "pretty damn hard for a baby" in his words. Although she whimpered, he put her down for a nap and told her to stop crying. After he put her down for a nap, "I started seeing some signs of her not being well," but it was not until after his aunt arrived that he called 911. "[W]hile it was happening in my own mind, I knew it was wrong." He thought he grabbed her at about 11:30 in the morning (or over three hours before he called 911). After he was arrested he said "Just like I said, I mean, after she vomited from eating the cereal, I got upset with her, and I picked her up and squeezed her, swatted her on her back a couple two times."

Gernandt told [petitioner] he would be charged with murder if Leah died, then left the room. While [petitioner] was alone, he said "oh, man. It's over. It's over. It's over. . . . Fuck. It's over. I won't have a job. I won't have nothin'. It's over. Oh, shit." Later he told Gernandt "Oh, man. I can't believe this. My life is over." He then asked if he was still considered a minor, but Gernandt said no.

The jury heard audio tapes of the 911 call, during which [petitioner's] voice is calm.

4

1       The defense called friends and a neighbor who testified [petitioner]
2 was good with children and did not hurt them.  On cross-
examination one friend indicated an "ordinary, caring parent"
3 would get help right away if "you saw a child begin to vomit, lose
consciousness, grow pale, have blue lips," and would "expect an
4 ordinary caring parent to put that child's needs above any desire to
protect yourself." [Petitioner] tried to have a defense pathologist
5 corroborate a theory Leah hurt herself on the handlebars of a
tricycle, but the pathologist thought it was unlikely because of the
6 force needed.  He also testified the symptoms of shock might not
be apparent right away, that they would increase as more blood was
7 lost in the body.

8 [Petitioner] testified and gave a version radically inconsistent with
his story to the police.  We assume the jury disbelieved him.
9 [Petitioner] testified that after Tiernie went to work he fell asleep,
only to be wakened by the sound of Leah screaming; he found
10 Leah's  sister on top of her, bouncing on her stomach.  He claimed
Leah seemed like she was not feeling well and looked a little pale.
11 He gave them some food around 11:15 and after a while Leah's
sister reported Leah was choking.  He saw Leah's lips were a little
12 blue, picked her up "and I turned her around [] with my right arm.
I applied pressure to the bottom of her abdomen, and with my left
13 hand I slapped the lower part of her back."  He claimed this was an
effort to save her life, however he did not mention it to the police,
14 the paramedics nor the doctors that day, because he was "in a state
of shock."  He did not mention it on the videotape because "all I
15 could think about was Leah," although when asked on cross
examination why he made comments about not having a job and so
16 forth, but did not make comments expressing concern for Leah,
[petitioner] could not answer.  In any event, this supposed act of
17 heroism caused Leah to spit up a piece of food.  She then threw up
more food.  He put her down for a nap.  This was about 11:30 a.m.
18 or 12:00 noon.  His aunt and other relatives arrived around 2:00
p.m.  His aunt (Manolakas) checked on Leah and asked [petitioner]
19 to dress her in a shirt, which he did.  The family socialized until
close to 3:00 p.m., when the aunt found Leah very pale and
20 [petitioner] called 911.  He claimed he was initially prevented from
entering the back of the ambulance, but was allowed to sit up front.
21 He left the ambulance to find out about the delay, then reentered it.
At the hospital he was put in a room and prevented from leaving.

22 (People v. Vigil, slip op. at 2-9 (Pet., Ex. A at 2-9)).

23       In affirming petitioner's conviction, the state appellate court addressed each of the

24 claims contained in the instant petition.  The California Supreme Court denied review without

25 comment.  Petitioner did not seek habeas relief in state court.

26 /////

5

1    ANALYSIS

2  I.  <u>Standards for a Writ of Habeas Corpus</u>

3          Federal habeas corpus relief is not available for any claim decided on the merits in

4  state court proceedings unless the state court's adjudication of the claim:

5          (1) resulted in a decision that was contrary to, or involved an
           unreasonable application of, clearly established Federal law, as
6          determined by the Supreme Court of the United States; or

7          (2) resulted in a decision that was based on an unreasonable
           determination of the facts in light of the evidence presented in the
8          State court proceeding.

9  28 U.S.C. § 2254(d).

10         Under section 2254(d)(1), a state court decision is "contrary to" clearly

11 established United States Supreme Court precedents "if it 'applies a rule that contradicts the

12 governing law set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are

13 materially indistinguishable from a decision'" of the  Supreme Court and nevertheless arrives at

14 different result.  <u>Early v. Packer</u>, 573 U.S. 3, 8 (2002) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362,

15 405-406 (2000)).

16         Under the  "unreasonable application" clause of section 2254(d)(1), a federal

17 habeas court may grant the writ if the state court identifies the correct governing legal principle

18 from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

19 prisoner's case.  <u>Williams</u>, 529 U.S. at 413.  A federal habeas court "may not issue the writ

20 simply because that court concludes in its independent judgment that the relevant state-court

21 decision applied clearly established federal law erroneously or incorrectly.  Rather, that

22 application must also be unreasonable."  <u>Id.</u> at 412; <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75

23 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

24 question, is left with a 'firm conviction' that the state court was 'erroneous.'")

25         The court looks to the last reasoned state court decision as the basis for the state

26 court judgment.  <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

6

reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

II.  Petitioner's Claims

    A.  Miranda Claim

        Petitioner claims the introduction of his videotaped confession violated his constitutional rights because the confession was involuntary and taken without the warnings required under Miranda v. Arizona, 384 U.S. 436 (1966).[1]

        The prosecutor submitted petitioner's confession as evidence in its case in chief, before he testified.  Constitutional error would lie either if petitioner's statements were made in violation of Miranda or if his statements were involuntary.

        The court of appeal reviewed petitioner's videotaped confession and determined it was voluntary.[2]  Petitioner offers no evidence outside the confession itself bearing on the issue. The court of appeal reasonably interpreted the facts, based on a fact-finding process that was

_____

[1]  In Miranda, the Supreme Court held "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  Statements that are taken without Miranda warnings can be used to impeach a defendant if he testifies; involuntary statements cannot be introduced for any purpose.  Michigan v. Harvey, 494 U.S. 344, 354-55 (1990); Pollard v. Galaza, 290 F.3d 1030, 1033 (9th Cir. 2002); Henry v. Kernan, 197 F.3d 1021, 1026 (9th Cir. 1999).  A confession is involuntary if the police used coercive means to undermine the suspect's ability to exercise his free will, taking into consideration the effect on the defendant of the officer's entire course of conduct.  Henry, 197 F.3d at 1026.  Calculated police misconduct to obtain a confession is a factor in determining its voluntariness.  Id. at 1024.

[2]  The court of appeal found the manner of questioning was not hostile and petitioner answered questions without hesitation and laughed a few times.  (Pet. Ex. A at 16.)  No weapons were displayed and the only physical touching occurred when the officer put his hand on petitioner's shoulder and rubbed it.  Id.  At another point Gernardt patted petitioner on the shoulder, without petitioner's protest.  Id.  The tactics employed were not abusive and there is no evidence they undermined petitioner's free will.  Id.  Although petitioner was relatively young, 20, he was mature, held a job, and had assumed the role of husband and father in an existing family.  Id. at 17.  While petitioner may have lacked experience with police, he knew enough to inquire whether he still was considered a minor under the law.  Id.  Petitioner described himself as "upset" but in "pretty good health," but claimed to be "sick to his stomach" because he "had not eaten."  Id.  He was not disabled by pain.  Id.

1  sufficient in context.  This state court factual determination is entitled to a presumption of

2  correctness, which petitioner offers nothing to overcome.  His confession was voluntary.

3        Concerning <u>Miranda</u>, the court of appeal found petitioner was not "in custody"

4  because he was free to go during his interview with Gernarndt.[3]  (Pet., Ex. A at 16; CT 103-04.)

5  This determination also is entitled to a presumption of correctness which petitioner offers

6  nothing to overcome.  There was no federal constitutional error in the state's use of petitioner's

7  confession.

8        B.  <u>Trial Court's Improper Comments</u>

9        Petitioner claims comments by the trial court violated his right to due process.

10  The jury was sworn May 5, 1998, and the prosecutor called four witnesses: the victim's mother,

11  firefighter and emergency response technician Brian Rice, paramedic Thor Crain and sheriff

12  deputy Auleb.

13        The morning of May 6, the trial court made the following comment to the jury

14  before the prosecutor called her first witness:

15  
16        Did all of you keep up with the news today?  I think you can only
       conclude that you should be very careful what you say and to
       whom you say it, and that the first opportunity you should confess

17        your transgressions.  And in that light, I want to tell you that I've
       lied to my grandchildren.  I told them that if my mother had not

18        kissed my father I would have been a normal frog.

19  (RT 140:19-25.)

20        The prosecutor then called four more witnesses: petitioner's aunt, emergency

21  physician Dr. Lance, pediatric intensivist Dr. Eldridge and forensic pathologist Dr. Anthony.

22        The morning of May 7 the defense moved for a mistrial based on the court's

23  comment the preceding morning.  (RT 332-35.)  Defense counsel acknowledged the judge had

24  
       _____

25        [3]  "The sine qua non of <u>Miranda</u> is custody.  "By custodial interrogation, we mean
       questioning initiated by law enforcement after a person has been taken into custody or otherwise
       deprived of his freedom of action in any significant way."  <u>U.S. v. Butler</u>, 249 F.3d 1094, 1098

26  (9th Cir. 2001), <u>quoting</u> <u>Miranda</u>, 384 U.S. at 444.

not intended his comment to relate to the trial.  Id.  The prosecutor pointed out that testimony by doctors that Leah might have lived had petitioner sought immediate care came out after the judge's comment, which touched on matters in the news and was not intended to relate to the case.  Id.  The court denied the motion for mistrial.  Id.

The jury was called in and the judge admonished them:

> It was reported that the king was so disgusted with the attempt at humor of the court jester that he warned him to not persist in stale and unhumorous jokes, but the jester could not help himself.  And that the king ordered that he be executed, and a [sic] execution was about to take place.  But the king had second thoughts, and thought if he were to promise not to tell another joke, I will spare his life.  So the word was sent through the executioner to the jester in which the executioner asked the jester, or told the jester, if he promised never again to tell another joke that his life would be spared.  The jester said, "No noose is good news."  I did such a thing yesterday.  It was stupid, unexcusable and foolish.  I attempted humor in a case in which there is no humor.  It is serious to both sides, and that alone is serious departure on my behalf from what I perceive myself to be, correct conduct on the part of a judge.  Not only that, the attempt at humor was a statement that should not have been made in any respect because in some way it would be associated with some feeling on my part with respect to this case or with respect to the law.  And such is not the case.  If it created any impression that what I said had anything to do with this case, or with what you should find to be the facts or my feelings concerning the seriousness of this case, you should disregard it and form your own opinions.  I did not intend in any way to detract or interfere with what you should find to be the facts.  It was stupid on my part, untimely, inconsiderate, and I apologize for it.

(RT 337:14 - 338:15.)

The prosecutor laid the foundation and played the 911 tapes and petitioner's videotaped confession.  (RT 340-44.)  The court further admonished the jury:

> Ladies and gentlemen, now that you've heard the tape, I want to again admonish you that the statements I made and the inadvertent attempt at humor has nothing whatsoever to do with this case or with the evidence that you just heard.  Is there anybody here who feels he cannot completely disregard my remarks?  Feel free to let me know if you feel you cannot.  Once again, I apologize for such remarks.  There is no excuse for attempt at humor.

(RT 344:28 - 345:7.)

9

1    The court of appeal found the judge's comment about the benefit of confessing

2  one's transgressions "at the earliest opportunity" did not warrant a mistrial.  (Pet., Ex. A at 28-

3  32.)  The judge's reference to lying and admitting transgressions did <u>not</u> relate to the trial, but

4  rather concerned a front-page story in the Sacramento Bee stating a federal court had denied

5  President Clinton's assertion of executive privilege during investigation of the Monica Lewinsky

6  affair.  <u>Id.</u>  Apparently, the trial judge was insinuating that President Clinton should have

7  confessed his transgressions earlier.  The appellate court noted the judge had informed the jury

8  the comment was <u>not</u> associated with his opinion about the case, nor was it intended to interfere

9  with the jury's factual findings.  <u>Id.</u>  After the confession was played the judge reiterated that his

10  comment had nothing whatsoever to do with that evidence.  <u>Id.</u>

11    On direct appeal, the standard for reversal based on general judicial misconduct is

12  stringent – there must be an "extremely high level of interference by the trial judge which creates

13  a pervasive climate of partiality and unfairness."  <u>Duckett v. Godinez</u>, 67 F.3d 734, 740 (9th Cir.

14  1995) (internal quotations omitted).  On habeas, the standard is even more stringent: reversal is

15  warranted only if "the state trial judge's behavior rendered the trial so fundamentally unfair as to

16  violate federal due process. . ."  <u>Id.</u>

17    The court of appeal determined the judge's comment did not express his opinion

18  of the evidence, and this finding is entitled to deference.  Nevertheless, due process was violated

19  if the jury's interpretation of the comment rendered petitioner's trial fundamentally unfair.  The

20  sole disputed element of the § 273ab charge was whether petitioner used a degree of force on

21  Leah that a reasonable person would have known was likely to produce great bodily injury.

22  Whether petitioner should have confessed sooner bore little or no relation to that factual issue.

23  The court admonished the jury its comments bore no relation to the jury's fact finding.  That the

24  jury remained impartial and cognizant of its duties is illustrated by the split verdict - petitioner

25  /////

26  /////

was not found guilty of Count I.[4]  Petitioner's claim that judicial misconduct violated his right to due process fails.

   C.  Juror Misconduct

      Petitioner next argues the trial court violated due process by failing to conduct a hearing concerning possible juror misconduct.  The juror in question approached Rice in the hallway after Rice testified about his response to the 911 call and attempts to save Leah.  The juror patted Rice on the knee and said, "good job."  (RT 371-72.)

      "Any unauthorized communication between a juror and a witness or interested party is presumptively prejudicial, but the government may overcome the presumption by making a strong contrary showing."  Caliendo v. Warden of California men's Colony, 365 F.3d 691, 694 (9th Cir. 2004), citing Mattox v. United States, 146 U.S. 140, 142 (1892); Remmer v. United States, 347 U.S. 227, 228 (1954).  "[I]f an unauthorized communication with a juror is de minimus, the defendant must show that the communication could have influenced the verdict before the burden of proof shifts to the prosecution . . . [and] must offer sufficient evidence to trigger the presumption of prejudice."  Caliendo, 365 F.3d at 696 (internal quotations omitted). If a communication is not de minimus, prejudice is presumed and the defendant is entitled to a new trial "unless the prosecution shows that there is no reasonable possibility that the communication will influence the verdict."  Id.

      The state appellate court concluded that the juror's contact with Rice did not result in prejudice to petitioner, stating as follows:

>      Appellate counsel tries to make a mountain of this molehill.  A
> juror made a friendly comment to a man who had testified to heroic
> efforts to save a baby's life.  The trial court handled the matter in a

---

   [4]  Even if the judge had expressed his opinion on the facts, it would have been permissible because he made it clear all matters of fact were submitted for the jury's determination.  Quercia v. United States, 289 U.S. 466, 470-72 (1933); United States v. James, 576 F.2d 223, 228 (9th Cir. 1978).

conscientious and efficient way.  This incident does not raise a
presumption a juror prejudged the case.

* * *

Even if a presumption of prejudice was triggered, the presumption
was dispelled because there is no substantial likelihood the juror
was biased against [petitioner].

(Answer, Ex. 1 at 24, 26-27.)

         After a review of the record, this court concludes that the contact that occurred

here between the juror and Rice was de minimus and could not have influenced the verdict.

Factors relevant to this inquiry include "the length and nature of the contact, the identity and role

at trial of the parties involved, evidence of actual impact on the juror, and the possibility of

eliminating prejudice through a limiting instruction."  Caliendo, 365 F.3d at 697-98.  The contact

that occurred in this case was momentary and did not involve matters crucial to the verdict.  As

noted by the trial court, Rice's testimony largely involved the circumstances under which Leah

received aid; the "the only controverted part of Rice's testimony was whether it was Rice or

someone else who directed [petitioner] to ride in the ambulance."  (Answer, Ex. 1 at 22.)  There

is no evidence that the juror's brief comment to Rice had any actual impact on any juror.  Indeed,

it appears that Rice said nothing in response to the juror's comment and there is no evidence the

other jurors even noticed the event.  Further, the trial court gave the jurors an instruction in

response to these events which reminded them of their obligation not to be influenced by

anything outside of the evidence in the case.  (Id. At 22-23; Reporter's Transcript on Appeal at

374-78.)

         Even assuming arguendo that the contact between the juror and Rice was more

than de minimus and triggered a presumption of prejudice, this court concludes that there is no

reasonable possibility the contact influenced the verdict.  For all of the reasons expressed above,

the incident between the juror and Rice was simply too inconsequential to rise to the level of a

federal constitutional violation.  Accordingly, petitioner is not entitled to relief on this claim.

1        D.  Prosecutorial Misconduct

2              Next, petitioner claims his right to due process was abridged because the

3    prosecutor's closing argument urged the jury to convict based on sympathy for Leah.  (RT 626,

4    632, 633, 641, 678, 680, 683.)  In such a claim, the only relevant question is whether the

5    prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a

6    denial of due process."  Darden v. Wainwright, 477 U.S. 168, 181 (1986); see also Drayden v.

7    White, 232 F.3d 704, 714 (9th Cir. 2000) (prosecutor speaking in the imagined voice of the

8    victim as a "witness" was improper but did not violate due process because prosecutor did not

9    manipulate or misstate the evidence).

10             The court of appeal found this claim defaulted based on trial counsel's failure to

11   object during trial.  Alternatively, it concluded that petitioner failed to show prejudice because

12   there was compelling evidence of guilt.  This court agrees with the latter conclusion.  Evidence

13   of petitioner's guilt was overwhelming and prosecutorial comment, which did not misstate the

14   evidence, did not subvert petitioner's fair trial rights.

15       E.  Whether Penal Code § 273ab is Unconstitutional

16             Petitioner claims that imposition of a life sentence for violation of Penal Code §

17   273ab impermissibly abridges his Fifth and Sixth Amendment rights by permitting conviction for

18   homicide and a first degree murder sentence in the absence of proof of a culpable mental state.

19   Petitioner invokes California's "Ireland Rule" which prohibits murder liability premised on a

20   theory of felony murder when the underlying felony offense is an assault which caused the

21   homicide.  See People v. Ireland, 70 Cal. 2d 522 (1969).  The court in Ireland relied only on its

22   interpretation of state and common law, making no reference to the federal constitution or its

23   provisions.  70 Cal. 2d at 538-40.  Petitioner's challenge to § 273ab under Ireland is a state law

24   claim that does not state a claim for relief in this federal habeas corpus action.  His claim should

25   be denied.

26   /////

13

1    F.  Cruel and Unusual Punishment

2          Petitioner claims his sentence violates the cruel and unusual punishment clause.

3    Outside capital cases, which are different, the Eighth Amendment requires no strict

4    proportionality between crime and sentence but rather forbids only extreme sentences that are

5    "grossly disproportionate" to the crime.  Harmelin v. Michigan, 501 U.S. 957 (1991); Lockyer v.

6    Andrade, 538 U.S. 63 (2003).  What indicates gross disproportionality remains unclear; all that

7    can be said is that it should be informed by objective factors (the most important of which is the

8    type of punishment as opposed to the length of a term of imprisonment for years) and will be

9    found only in the "exceedingly rare" and "extreme" case.  The solitary example in Supreme

10   Court jurisprudence is Weems v. United States, 217 U.S. 349 (1910) in which a government

11   disbursing officer convicted of making false entries of small sums in his account book was

12   sentenced to 15 years' "hard and painful" labor with chains fastened to his wrists and ankles at

13   all times, permanent disqualification from holding any position of public trust, subjection to

14   government surveillance for life, and deprivation of any right of parental authority, guardianship

15   or participation in the family council.  There simply are no objective factors to distinguish

16   between sentences to imprisonment for varying terms of years; the length of such sentences is

17   purely a matter of legislative prerogative (so long as a legislature does not make something as

18   trivial as overtime parking punishable by life imprisonment).  Rummel v. Estelle, 445 U.S. 263,

19   274 (life imprisonment for three petty thefts involving less than $230 does not violate Eighth

20   Amendment).  Here, petitioner was convicted of aggravated assault on Leah while she was in his

21   care, causing her death, and he points to no objective factors that so trivialize his offenses as to

22   make the legislative determination "grossly disproportionate" in the constitutional sense.  This

23   claim fails.

24   G.  Jury Instruction Error

25          Petitioner's final claim is that the trial court violated due process by giving an

26   instruction that improperly permitted consideration of propensity evidence.

1    Petitioner's jury was instructed with CALJIC No. 2.50, as follows:

2    Evidence has been introduced for the purpose of showing that the
     defendant committed a crime other than that for which he is on
3    trial.

4    This evidence, if believed, may not be considered by you to prove
     that defendant is a person of bad character or that he has a
5    disposition to commit crimes. *It may be considered by you only
     for the limited purpose of determining if it tends to show:*

6
     *a clear connection between the other offense and the one of which
7    the defendant is accused so that it may be inferred that if defendant
     committed the other offense defendant also committed the crime
8    charged in this case.*

9    (Clerk's Transcript on Appeal (CT) at 177.) (emphasis added).[5]  Petitioner's jury was also

10   instructed with CALJIC No. 2.50.1, as follows:

11   Within the meaning of the preceding instructions, the prosecution
     has the burden of proving by a preponderance of the evidence that
12   a defendant committed a crime other than those for which he is on
     trial.
13
     You must not consider this evidence for any purpose unless you
14   find by a preponderance of the evidence that a defendant
     committed the other crime.

15

16   (Id. at 178.)  Finally, petitioner's jury was instructed with CALJIC No. 2.50.2, as follows:

17   "Preponderance of the evidence" means evidence that has more
     convincing force than that opposed to it.  If the evidence is so
18   evenly balanced that you are unable to find that the evidence on
     either side of an issue preponderates, your finding on that issue
19   must be against the party who had the burden of proving it.

20   You should consider all of the evidence bearing upon every issue
     regardless of who produced it.

21

22   (Id.)  Petitioner argues that these instructions, when read together, "misleadingly told the jurors

23   that a conviction could be based on proof by a preponderance of evidence of bad character or

24   uncharged offenses rather than proof beyond a reasonable doubt of charged crimes."

25   _____

26        [5]  Petitioner specifically complains of the italicized portion of this instruction.

15

1  (Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus

2  (P&A) at 60.)

3          A challenge to jury instructions generally does not state a federal constitutional

4  claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) citing Engle v. Isaac, 456

5  U.S. 107, 119 (1982); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to

6  warrant federal habeas relief, a challenged jury instruction cannot be merely "undesirable,

7  erroneous, or even universally condemned, but must violate some due process right guaranteed

8  by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988), quoting

9  Cupp v. Naughten, 414 U.S. 141, 146 (1973) (internal quotations omitted).  Petitioner must

10  demonstrate the instruction "'so infected the entire trial that the resulting conviction violates due

11  process.'"  Id. quoting Darnell v. Swinney, 823 F.2d 299, 301 (9th Cir. 1987).

12          Evidence was introduced at trial that petitioner on occasion used marijuana.  The

13  court of appeal found drug evidence had no connection with Leah's death and it would be

14  "irrational to infer the jury found defendant guilty of child-homicide because he had marijuana in

15  the house." (Pet., Ex. A at 21.)  In light of the overwhelming evidence against petitioner, this

16  court cannot conclude the challenged instruction rendered his trial unfair.

17          The state appellate court also rejected petitioner's claim that his jury was allowed

18  to find him guilty on a standard less than beyond a reasonable doubt.  (Id.)  This court agrees

19  with the state court's conclusion in this regard.  Contrary to petitioner's argument, the challenged

20  jury instructions did not tell the jurors that his conviction on the charges against him could be

21  based on proof by a preponderance of evidence rather than proof beyond a reasonable doubt.

22  Rather, petitioner's jurors were specifically informed that each element of the offenses against

23  petitioner must be proven beyond a reasonable doubt and that only the prior acts could be proved

24  by a preponderance of the evidence.  (CT at 173, 174, 178, 180.)  Cf. Gibson v. Ortiz, 387 F.3d

25  812, 821-825 (9th Cir. 2004) (trial court's use of the 1996 version of CALJIC No. 2.50.01,

26  together with CALJIC No. 2.50.1 violated defendant's right to due process by allowing the jury

1   to find that the defendant had committed uncharged offenses by a preponderance of the evidence

2   and then to infer that he had committed the charged acts also by a preponderance of the

3   evidence).  Petitioner's jurors were also specifically informed that the prior crimes evidence

4   could not be considered to prove that petitioner had a disposition to commit crimes, but only to

5   show similar modus operandi.  (CT at 177.)  Cf. Gibson, 387 F.3d at 817 (jury was specifically

6   informed that if they found the defendant committed a prior offense they were allowed to also

7   infer that he had a disposition to commit the same or similar offenses, including the offense of

8   which he was accused).  After a review of the jury instructions as a whole, this court concludes

9   that the state court's decision that the challenged jury instructions did not violate petitioner's

10  right to a fair trial is not contrary to or an unreasonable application of federal law.  Accordingly,

11  petitioner's claim fails.

12          For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that

13  petitioner's application for a writ of habeas corpus be denied.

14          These findings and recommendations are submitted to the United States District

15  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

16  days after being served with these findings and recommendations, any party may file written

17  objections with the court and serve a copy on all parties.  Such a document should be captioned

18  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

19  shall be served and filed within ten days after service of the objections.  The parties are advised

20  that failure to file objections within the specified time may waive the right to appeal the District

21  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

22  DATED: June 15, 2006.

23

24                                          UNITED STATES MAGISTRATE JUDGE

25

26
    008:vigil1481.hc